OPINION
{¶ 1} Defendant-appellant Spencer Dean Woodgeard appeals his conviction and sentence from the Fairfield County Court of Common Pleas on one count of possession of drugs in violation of R.C. 2925.11(A) and R.C. 2925.11(C)(4)(b). Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE
{¶ 2} On December 30, 1999, the Fairfield County Grand Jury indicted appellant on one count of preparation of drugs for sale in violation of R.C. 2925.07(A) and R.C. 2925.07(C)(4)(c), a felony of the fourth degree, and one count of possession of drugs (cocaine) in violation of R.C. 2925.11(A) and R.C. 2925.11(C)(4)(b), also a felony of the fourth degree. At his arraignment on February 15, 2001, appellant entered a plea of not guilty to the charges contained in the indictment.
{¶ 3} Thereafter, appellant filed a "Motion to Dismiss and to Suppress Evidence" on February 28, 2001, arguing, in part, that his Constitutional rights "were violated by the unlawful and unwarranted seizure and search of his person outside his home." A memorandum in opposition to the same was filed by appellee on March 14, 2001. The following evidence was adduced at the April 23, 2001, suppression hearing.
{¶ 4} On September 13, 1999, Deputy Kevin Kelly, an auxiliary officer with the Fairfield County Sheriff's Office, was working the 4:00 p.m. to midnight shift with Deputy Carl Lape. As the two were heading in for the night at the end of their shift in their marked cruiser, they saw a vehicle pulled over to the side of the road in a dark area with its lights off that they thought might have been abandoned. There were no street lights in the area. When the two officers stopped to check on the vehicle, Deputy Lape aimed a spotlight on the same to read the license plate, revealing two or three people inside the vehicle. After parking the cruiser behind the vehicle, the two officers asked the vehicle's occupants why they were stopped. At the suppression hearing, Deputy Kelly testified that "[they indicated they were having vehicle problems." Transcript at 13. There were a total of three people inside of the vehicle.
{¶ 5} When Deputy Lape called in the name and social security numbers for each of the three individuals to check if there were any outstanding warrants, it was discovered that there was a felony warrant out of Columbus pending for Mr. Gillenwater, one of the vehicle's occupants. Deputy Kelly testified that, in addition to the felony warrant, Gillenwater also had "a police caution out on him". Transcript at 15. According to Deputy Kelly:
 {¶ 6} "A police caution, you need to take extra special care of the individual, because they're considered dangerous. It came back later that I guess he was assaultive of police officers when we got more information later on at the — it just advises police officers this is a dangerous individual and you need to be careful about them."
{¶ 7} Transcript at 15. There were no outstanding warrants for the other two individuals in the vehicle, one of whom was appellant and the other James Bruney, who was the driver.
{¶ 8} After learning of Gillenwater's outstanding felony warrant, Deputy Lape told Deputy Kelly that "we were going to handcuff everyone for our own safety and theirs, and he advised that he was going to pat down Gillenwater and he told me to pat down Woodgeard [appellant] and Bruney." Transcript at 16. According to Deputy Kelly, the two deputies decided to pat down everyone since they believed that they "were dealing with a very dangerous person [Gillenwater]" and were "at the height of alertness" and since they wanted to make sure that "everyone was clean of weapons." Transcript at 16, 26. During redirect examination, Deputy Kelly admitted that the fact there were three people and only two deputies made a difference in their decision to conduct a pat down search for weapons. According to Deputy Kelly, "if Gillenwater would have had a weapon, he could easily have passed it off to Woodgeard [appellant] or Bruney. And, . . . they could very well have shot us while we were conducting a pat-down of Gillenwater." Transcript at 31.
{¶ 9} When Deputy Kelly patted down appellant, he did not find any weapons. However, when Deputy Kelly was asked whether he felt anything else during the pat down search, the following testimony was adduced:
 {¶ 10} A. Yes. When I started to search him on his lower right pair of shorts, there was a pocket there. And as I was running my hand down the side of it, I was able to hear the crinkly sound of plastic and a big lump right underneath it. And from my past experience in the Police Academy searching people with drugs and stuff like that, it felt like drugs to me, so I removed it.
{¶ 11} Q. Okay. And it was a hard rock substance?
 {¶ 12} A. Well, there was different types. He had also marihuana [sic] in there, so that was kind of soft too. But there was also a hard substance in there too, yes.
 {¶ 13} Q. Okay. But I guess my — the important question I have is, when you initially felt the back pocket — —
{¶ 14} A. Okay.
 {¶ 15} Q. — I think you testified that you felt a bag?
 {¶ 16} A. Well, I was able to run my hand down his side. You could hear the crunchiness of the bag, and then there was a lump in the pocket itself.
 {¶ 17} Q. Okay. So you felt the bag or heard the bag and also the rock.
{¶ 18} A. Yeah.
 {¶ 19} Q. And that's all you felt at that time; is that right?
{¶ 20} A. Yes.
 {¶ 21} Q. Okay. All right. And then at that point in time, you — based upon your training, you felt it to be drugs, and that's when you extracted the drugs?
{¶ 22} A. Yes, sir.
{¶ 23} Transcript at 17-19. When Deputy Kelly took the drugs out of appellant's pocket, he found "a white substance and a green leafy substance" in sandwich bags. Transcript at 21. According to the officer, the white substance was "kind of a rock substance. It was kind of hard." Transcript at 21. Deputy Kelly testified that the white substance taken from appellant's pocket was 14 grams of powder cocaine rather than crack cocaine.
{¶ 24} Deputy Carl Lape also testified at the suppression hearing in this matter. When asked during direct examination what a "cop caution" meant, Deputy Lape responded that "[t]o me, it means more or less for me to be weary [sic] of the individual, that he could possibly resist, could be violent." Transcript at 42. According to Deputy Lape, the two deputies decided to handcuff all three occupants of the vehicle and subject them to a pat down search since ". . . for their protection and our protection, we were going to place handcuffs on them and do a quick pat-down. And if everything came back clean, that we'd let them go." Transcript at 42. Deputy Lape also testified that they patted down all three individuals since they "wanted to give the appearance that they [the occupants of the vehicle] would all be treated equal." Transcript at 56. According to Deputy Lape, both deputies were concerned that Gillenwater could have passed a weapon to either appellant or Bruney before getting out of the vehicle.
{¶ 25} James Bruney was the final witness to testify at the suppression hearing. Bruney testified that, on September 13, 1999, he drove appellant to Columbus to pick up Gillenwater, appellant's friend, and then was taking appellant back home. According to Bruney, as he was driving back from Columbus, appellant and Gillenwater had to use the restroom. After appellant informed Bruney that he was friends with a person who lived in a nearby residence, Bruney pulled into the driveway of the residence, turned the car lights off and shortly thereafter, "a police officer pulled in behind us, got out of the car, and asked us what we were doing." Transcript at 62. Bruney testified that he told the officers that they were in the driveway "because it was a friend of Mr. Woodgeard's and Mr. Woodgeard said it was okay for us to go there." Transcript at 68.
{¶ 26} According to Bruney, after learning of the outstanding warrant for Gillenwater, the deputies proceeded to arrest Gillenwater and "searched me, they searched Woodgeard [appellant], and they said that they were going to handcuff us for their protection." Transcript at 63. Bruney estimated that he was detained for approximately one hour.
{¶ 27} At the conclusion of the hearing, the trial court overruled appellant's Motion to Suppress, holding that the search of appellant and seizure of the contraband was proper. An entry overruling the same was filed on April 26, 2001. Subsequently, appellant filed a "Renewed Motion to Dismiss and to Suppress Evidence Based Upon a Recent Pronouncement of the Ohio Supreme Court in State v. Lozada (2001),92 Ohio St.3d 74." After appellee filed a memorandum in opposition and appellant, in turn, filed a reply brief, the trial court overruled appellant's motion.
{¶ 28} On October 1, 2001, appellant withdrew his former not guilty plea and entered a plea of no contest to the charge of possession of drugs in violation of R.C. 2925.11(A) and R.C. 2925.11(C)(4)(b). The remaining count in the indictment was dismissed.[1] Pursuant to a Judgment Entry of Sentence filed on October 10, 2001, appellant was sentenced to prison for a period of six months and ordered to pay a fine in the amount of $500.00 and costs. In addition, appellant's driver's license was suspended for a period of six months. The trial court, however, suspended appellant's prison sentence and placed appellant on community control for a period of five years. As part of his community control, appellant was ordered to serve thirty days in jail and to successfully complete drug/alcohol counseling.
{¶ 29} Appellant now prosecutes his appeal, raising the following assignments of error:
 {¶ 30} I. "THE TRIAL COURT COMMITTED ERROR WHEN IT OVERRULED THE DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED ILLEGALLY AND IN VIOLATION OF THE DEFENDANT'S FOURTH, FIFTH AND FOURTEENTH AMENDMENT RIGHTS, YBARRA V. ILLINOIS (1979), 444 U.S. 85, 91, AND THUS DID IT COMMIT ERROR IN FAILING TO DISMISS THE INDICTMENT FOR A FATAL ERROR IN THE INITIATION OF THE PROSECUTION."
 {¶ 31} II. "THE TRIAL COURT COMMITTED ERROR WHEN IT REFUSED TO FOLLOW THE MANDATES OF THE OHIO SUPREME COURT AS ESTABLISHED IN STATE V. LOZADA (2001), 92 OHIO STATE 3rd. 74."
 I, II
{¶ 32} Appellant, in his two assignments of error, challenges the trial court's denial of his Motion to Suppress.
{¶ 33} There are three methods of challenging on appeal a trial court's ruling on a motion to suppress. First, an appellant may challenge the trial court's findings of fact. In reviewing a challenge of this nature, an appellate court must determine whether said findings of fact are again the manifest weight of the evidence. State v. Fanning
(1982), 1 Ohio St.3d 19, 437 N.E.2d 583; State v. Klein (1991),73 Ohio App.3d 486, 597 N.E.2d 1141; State v. Guysinger (1993),86 Ohio App.3d 592, 621 N.E.2d 726. Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. State v. Williams (1993),86 Ohio App.3d 37, 619 N.E.2d 1141, overruled on other grounds. Finally, assuming the trial court's findings of fact are not against the manifest weight of the evidence and it has properly identified the law to be applied, an appellant may argue the trial court has incorrectly decided the ultimate or final issue raised in the motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. State v.Curry (1994), 95 Ohio App.3d 93, 641 N.E.2d 1172; State v. Claytor
(1993), 85 Ohio App.3d 623, 620 N.E.2d 906.
{¶ 34} Both the Fourth Amendment to the United States Constitution and Article I, Sec. 14 of the Ohio Constitution prohibit unreasonable searches and seizures. A police officer does not violate the Fourth Amendment "by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen, . . ." Florida v. Royer (1983), 460 U.S. 491, 497. When a police officer merely approaches a person seated in a parked car, no "seizure" of the person occurs so as to require reasonable suspicion supported by specific and articulable facts. State v. Johnston (1993),85 Ohio App.3d 475, 478, 620 N.E.2d 128. These encounters fall outside the Fourth Amendment. Id. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that `seizure' has occurred." State v. Haberman
(June 2, 2000), Fairfield App. No. 99CA0068, (citing Terry v. Ohio
(1968), 392 U.S. 1).
{¶ 35} In the case sub judice, the deputies did not stop the vehicle in which appellant was a passenger. Rather, such vehicle was already parked on the side of the road before the deputies arrived. SeeState v. Bernal (Dec. 3, 1999), Wood App. No. WD-99-030, (consensual encounter when vehicle was stuck in mud and officer approached vehicle) (citing United States v. Mendenhall (1980), 446 U.S. 544, 553,100 S.Ct. 1870, 64 L.Ed.2d 497) and State v. McDonald (April 24, 2001), Fairfield App. No. 2000-CA-51.[2] Therefore, the deputies did not need reasonable and articulable suspicion to approach such vehicle. See also State v.McCray (March 8, 2000), Lorain App. No. CA99CA007310.
{¶ 36} The next issue for determination is whether the deputies had reasonable, articulable suspicion sufficient to detain appellant for purposes of investigation. The detention of an individual by a law enforcement officer does not violate the Fourth Amendment to the United States Constitution or Section 14, Article I of the Ohio Constitution if there are, at the very least, "specific and articulable" facts indicating the detention was reasonable. See, State v. Chatton (1984),11 Ohio St.3d 59, 61, 463 N.E.2d 1237 and Terry v. Ohio (1968),392 U.S. 1, 21-22. To justify an investigatory detention, a law enforcement officer must "demonstrate specific and articulable facts which, when considered with the rational inferences therefrom, would, in light of the totality of the circumstances, justify a reasonable suspicion that the individual who is stopped is involved in illegal activity." State v. Correa (1995), 108 Ohio App.3d 362, 366,670 N.E.2d 1035. See, Terry, supra. "The scope and duration of the investigative stop must last no longer than is necessary to effectuate the purpose for which the initial stop was made." State v. Bevan (1992),80 Ohio App.3d 126, 129, 608 N.E. 201 1099, citing Chatton, supra.
{¶ 37} Upon our review of the record, we find that the deputies had reasonable, articulable suspicion sufficient to justify an investigation. As is set forth above, the vehicle in which appellant was a passenger was parked at approximately midnight on the side of the road in a relatively rural area. Both the vehicle's headlights and interior lights were off. Deputy Lape testified that they believed that the vehicle was abandoned. However, when a spotlight was aimed at the vehicle to check the license plate, the two deputies "saw heads moving." Transcript at 38. Based on the foregoing, we find that, under the totality of the circumstances, the circumstances were such as to provide reasonable, articulable suspicion sufficient to justify the deputies' investigation into the situation.
{¶ 38} Appellant, in his assignments, also argues that the pat down search of his person was illegal. In Terry, supra., the United States Supreme Court held that a limited pat down search is justified when an officer reasonably concludes the individual, whose suspicious behavior he is investigating at close range, may be armed and, thus, dangerous to the police officer and others. Id. at 24. Officers need not forsake reasonable precautionary measures during the performance of their duties. State v. Evans, 67 Ohio St.3d 405, 409, 1993-Ohio-186,618 N.E.2d 162. The question we must ask is whether the officer had a reasonable, objective basis for frisking appellant. See, State v.Andrews (1991), 57 Ohio St.3d 86, 565 N.E.2d 1271. In determining whether an officer's beliefs are reasonable, a court must consider the totality of the circumstances involved in the stop. State v. Bobo
(1988), 37 Ohio St.3d 177, 180, 524 N.E.2d 489. An officer need not testify he was actually in fear of a suspect, but he must articulate a set of particular facts which would lead a reasonable person to conclude a suspect may be armed and dangerous. Evans, supra, at 413. Rather, "[e]vidence that the officer was aware of sufficient specific facts as would suggest he was in danger" satisfies the test set forth in Terry, supra. Id.
{¶ 39} At the suppression hearing in this case, the two deputies testified that they decided to pat down appellant and Bruney after learning of the outstanding felony arrest warrant and "cop caution" issued for Gillenwater. When asked whether he searched appellant because he felt a threat to his safety, Deputy Kelly responded as follows:
 {¶ 40} A. Yes, I did. I mean, we don't — in Fairfield County, we don't come across guys too often with felony warrants and a police caution. So we were at a height of alertness of what was going on. We were going to double check to make sure everything was okay and that he didn't have any weapons on him.
 {¶ 41} Q. Okay. Did it make any difference that there were three people here instead of one?
 {¶ 42} A. Well, yeah. I mean, there's more of them than there were deputies. So that's why we handcuffed everyone. Basically, because it prevents them from, if they do have weapons, pulling them out on us and harming us, and it lowers our level of force we have to use on them since they're already restrained.
{¶ 43} Transcript at 26-27. Both deputies testified at the hearing that they searched appellant and Bruney since they were concerned that Gillenwater, while still in the vehicle, could have passed a weapon to either one of them. Based upon the totality of the circumstances, we find a reasonable and prudent police officer would have conducted a protective search for weapons.[3]
{¶ 44} Appellant further contends that the scope of the pat down search exceeded that permitted by Terry since the identity of the contraband was not immediately apparent to Deputy Kelly. In Minnesotav. Dickerson (1993), 508 U.S. 366, the United States Supreme Court established the "plain feel" doctrine as it relates to a Terry pat down search for officer safety. In Minnesota, the court held that police may seize contraband detected through the sense of touch during a valid,Terry pat down if its identity as contraband is immediately apparent Id. In State v. Halczyszak (1986), 25 Ohio St.3d 301, 496 N.E.2d 925, paragraphs three and four of the syllabus, the Supreme Court of Ohio set forth what comprised "immediately apparent":
 {¶ 45} 3. The `immediately apparent' requirement of the `plain view' doctrine is satisfied when police have probable cause to associate an object with criminal activity.
 {¶ 46} 4. In ascertaining the required probable cause to satisfy the `immediately apparent' requirement, police officers may rely on their specialized knowledge, training and experience; * * *.
{¶ 47} If the officer conducting the search must manipulate the object to determine its identity as contraband, said search exceeds the scope of a lawful Terry search and any resulting seizure of contraband by the officer is not justified under the "plain feel doctrine." SeeMinnesota, supra.
{¶ 48} At the suppression hearing, Deputy Kelly testified as follows when asked what he felt during the pat down of appellant:
 {¶ 49} A. Yes. When I started to search him on his lower right pair of shorts, there was a pocket there. And as I was running my hand down the side of it, I was able to hear the crinkly sound of plastic and a big lump right underneath it. And from my past experience in the Police Academy searching people with drugs and stuff like that, it felt like drugs to me, so I removed it.
{¶ 50} Q. Okay. And it was a hard rock substance?
 {¶ 51} A. Well, there was different types. He had also marihuana [sic] in there, so that was kind of soft too. But there was also a hard substance in there too, yes.
 {¶ 52} Q. Okay. But I guess my — the important question I have is, when you initially felt the back pocket —
{¶ 53} A. Okay.
 {¶ 54} Q. — I think you testified that you felt a bag?
 {¶ 55} A. Well, I was able to run my hand down his side. You could hear the crunchiness of the bag, and then there was a lump in the pocket itself.
 {¶ 56} Q. Okay. So you felt the bag or heard the bag and also the rock.
{¶ 57} A. Yeah.
 {¶ 58} Q. And that's all you felt at that time; is that right?
{¶ 59} A. Yes.
 {¶ 60} Q. Okay. All right. And then at that point in time, you — based upon your training, you felt it to be drugs, and that's when you extracted the drugs?
{¶ 61} A. Yes, sir.
{¶ 62} Transcript at 17-19. In addition, the following testimony was adduced when Deputy Kelly was asked by the trial judge why he thought the item in appellant's pocket could be drugs:
{¶ 63} THE WITNESS: Well, from my —
 {¶ 64} THE COURT: First of all, you said it was a plastic crinkly sound. But anything else?
 {¶ 65} THE WITNESS: It was lumpy. I mean, he had — I believe he had like a pair of Umbro shorts on, so there's not a lot to them. So there was kind of a bulge. I mean, it was able to even show it more than if it were like a pair of jeans.
 {¶ 66} And the first indication I thought something was weird was, you know, the crinkliness of the plastic bag. And then as I ran my hand down farther, I could feel the bulge in his pocket.
{¶ 67} THE COURT: And what was the bulge?
{¶ 68} THE WITNESS: The drugs.
 {¶ 69} THE COURT: What did that feel like? I mean, how did — tell me why it felt what you thought was a contraband versus a Baby Ruth candy bar or something like that.
 {¶ 70} THE WITNESS: It felt lumpy, kind of a lumpy softness to it.
{¶ 71} THE COURT: Had you ever felt this before?
 {¶ 72} THE WITNESS: Oh, in the academy. You know, I've patted down other people before and usually they don't — their pockets don't make that kind of noise or have that type of formality to it.
 {¶ 73} THE COURT: Okay. That was the first thing you found after you — as you were patting him down for the weapon?
{¶ 74} THE WITNESS: Yes. . . .
 {¶ 75} THE COURT: What of your training suggested to you that what you felt was cocaine?
 {¶ 76} THE WITNESS: It had kind of a solid texture to it that —
{¶ 77} THE COURT: Was this crack cocaine —
{¶ 78} THE WITNESS: No.
{¶ 79} THE COURT: — or powder cocaine?
 {¶ 80} THE WITNESS: It was powder. And — I mean, we — it felt like the people I patted down in the academy, so, you know, I recalled in my memory of what that felt like. And, you know, I was feeling the same thing I'd felt a year before in the academy. And I removed it and I was correct in my assumption.
 {¶ 81} THE COURT: But it all came from your training in the academy; is that correct?
{¶ 82} THE WITNESS: Yes.
{¶ 83} Transcript at 33-36. Under the plain touch doctrine, this testimony was sufficient to establish that the incriminating nature of the object was "immediately apparent" to Deputy Kelly. We find, therefore, that the pat down search of appellant did not exceed that permitted by Terry.
{¶ 84} While appellant further maintains that the trial court erred when it failed to follow the mandates of State v. Lozada,92 Ohio St.3d 74, 2001-Ohio-149, 748 N.E.2d 520, we find that such case is distinguishable. The Ohio Supreme Court, in Lozada, held that during a routine traffic stop, it is reasonable for an officer to search the driver for weapons before placing the driver in a patrol car if placing the driver in the patrol car during the investigation (1) prevents the officers or driver from being subjected to a dangerous condition and (2) is the least intrusive means to avoid the dangerous condition. The Ohio Supreme Court further held, in Lozada, that it is unreasonable, during a routine traffic stop, for an officer to search the driver for weapons before placing the driver in a patrol car, if the sole reason for placing the driver in the patrol car during the investigation is for the convenience of the officer.
{¶ 85} Contrary to appellant's argument, in this matter, there was testimony presented at the suppression hearing that appellant was not patted down "clearly and solely for the convenience of the police officers." Rather, both deputies testified that they patted down appellant and Bruney after discovering the outstanding felony warrant and police caution issued with respect to Gillenwater. At the suppression hearing, both deputies testified that they were concerned for their safety and concerned that Gillenwater might have passed a weapon to one of his fellow passengers. By patting down appellant, the deputies clearly were attempting to avoid a dangerous situation. Moreover, we concur with the trial court that the method used by the officer, in patting down the three men, was the least intrusive method under the circumstances. As noted by the trial court at the October 1, 2001, plea hearing at which appellant's Renewed Motion to Suppress was considered:
 {¶ 86} Now, somebody could argue that, but it seems like — it seems though that the intrusion by just patting them down is the very least that they could do at the time for purposes of their own safety, and possibly the safety of other people in the vehicle. Maybe those who possibly — well, it wouldn't make a lot of difference, probably, but the primary reason is for the safety of the officers, and as I say, possibly the safety of passengers if one of those had been an innocent passenger, not knowing that the driver had a felony record and so forth.
 {¶ 87} But in any event, that was, as I recall, the decision of the Court at that time. And I think a reasonably prudent — in this case, the deputy — had authority here to pat them down without violating their civil rights in any way, and that that was the least intrusive method.
{¶ 88} Transcript of October 1, 2001, hearing at 9-10.
{¶ 89} Based on the foregoing, we find that the trial court did not err in overruling appellant's Motion to Suppress.
{¶ 90} Appellant's two assignments of error are, therefore, overruled.
{¶ 91} Accordingly, the judgment of the Fairfield County Court of Common Pleas is affirmed.
By EDWARDS, J. HOFFMAN, P.J. concurs in part and dissents in part WISE, J. concurs
 JUDGMENT ENTRY
{¶ 92} For the reasons stated in the Memorandum-Opinion on file, the judgment of the Fairfield County Common Pleas Court is affirmed. Costs to appellant.
[1] A Nolle Prosequi as to the remaining count (preparation of drugs for sale) was filed on October 10, 2001.
[2] In McDonald, this Court held that a deputy did not need reasonable and articulable suspicion to approach a vehicle that was stuck in the snow before the deputy arrived.
[3] {¶ a} The trial court stated, in part, on the record in overruling appellant's Motion to Suppress:
 {¶ b} THE COURT: All right. But indicated he [Gillenwater] was to be approached with caution, apparently.
 {¶ c} That, to me, is a very critical issue in this matter. If that hadn't have been the case, the arrest of Mr. Gillenwater would have been satisfactory. Making a case on behalf of the Prosecution that it was inappropriate to search the other two individuals would be questionable without knowing what the felony was, whether it was a theft or it was running — or having illegal weapons or things like that, that might have been another issue, even stronger. But the fact that it was indicated that Mr. Gillenwater was to be approached with caution, in their minds, that he was dangerous, that changes the tenor of the experience.
 {¶ d} As the Officer said, "We felt for our own safety that we needed to search the other two passengers in the event that Mr. Gillenwater had passed a weapon to them, "realizing that he knew he had a warrant out for his arrest, most likely. And because of that, they then proceeded to handcuff the other two and search them for their safety, since there was only two of them and three of the people in the vehicle. That, I find, is not unreasonable. Transcript at 106-107.